| .BYRNES, Chief Judge.
The plaintiff-appellant-cross-appellee, the Times-Pieayune Publishing Corporation (hereinafter referred to as the “T-P”) devolutively appeals that portion of the judgment of the trial court denying its claim against the defendants-appellees-eross-appellants, the New Orleans Publishing Group, Inc. and NOPG, L.L.C., (collectively hereinafter referred to as “NOPG”) for alleged violations of the Louisiana Unfair Trade Practices Act. NOPG cross-appealed suspensively those portions of the trial court judgment (1) condemning it to pay to the T-P the sum of $1,296,915.64 together with interest and costs (2) as well as ordering NOPG to deliver to the T-P all of its rights to engage in the publication of legal advertising which it possessed on July 16, 1992, including “Grandfather Clause Rights” under LSA-R.S. 43:201(C) and (3) enjoining NOPG from utilizing property rights acquired by the T-P under a certain Asset Purchase Agreement and Bill of Sale, including the Grandfather Clause Rights. We affirm that portion of the trial court judgment denying the T-P’s claim under the Louisiana Unfair Trade Practices Act and we reverse those portions of the judgment in favor of the T-P, largely in deference to our brethren of the Fifth Circuit who have already addressed lathe main issues in this case in a well reasoned opinion. Chiasson v. New Orleans Publishing Group, Inc., 99-1338 (La.App. 5 Cir. 4/25/00), 761 So.2d 89.
We adopt the facts, law and procedural history as set forth in the Chiasson opinion. Additionally we note that the trial court in Chiasson rendered its judgment on December 4, 1997. The trial court in the instant case rendered its judgment on February 10, 2000. The Fifth Circuit appellate Chiasson decision was rendered on April 25, 2000.
*36 As explained in greater detail by the Chiasson court, the T-P sued the NOPG in both Orleans Parish and Jefferson Parish. The suits are based on claims arising out of an Asset Purchase Agreement dated and a Bill of Sale dated whereby the T-P acquired certain rights and assets from NOPG. Both suits ultimately boh down to the interpretation of these two documents. Everything else is immaterial, mere legal “sound and fury, signifying nothing.”
In addition to the discussion found in the Chiasson opinion, we note that the Asset Purchase Agreement allocated $225,000.00 of the transaction’s purchase price for federal income tax purposes to the non-competition agreement. Although this fact was not mentioned in the Chiasson opinion, it does serve to reinforce the Chiasson conclusion that the non-competition clause was not mere surplusage. As the Chias-son opinion points out:
Included in the agreement is a non-competition provision. At the time of the agreement, only the T-P, the JP Times and CityBusiness were qualified to bid for the Jefferson Parish legal notices business. There were no other qualified competitors, nor could there have been any within the two years that the non-compete provision was effective, since no other publication could have met the five-year requirements of R.S. 43:201 A. [Footnote omitted.] Since the T-P specifically purchased the JP Times in the Asset Purchase Agreement, the non-competition provision had to have been inserted to |3prevent CityBusiness from competing. T-P’s interpretation of the agreement, that CityBusiness’ right to pursue the legal advertising and notices contract was transferred in the agreement, would make the non-competition provision meaningless. It is presumed that parties to contract do not include meaningless words.
We recognize that we are not bound by the opinions of our brethren of the Fifth Circuit except where res judicata applies, but we do respect their reported opinions, recognize their wisdom, and are generally persuaded by and follow their reasoning. After careful, independent analysis we can find no flaw in the reasoning of the Chiasson court concerning the implications of the non-competition clause. Id., 761 So.2d 94-95. We find no question of law that would raise any issue of legal philosophy concerning the Chiasson opinion as a whole with which this Circuit might be inclined to consider a view different from that of our brethren of the Fifth Circuit. And we especially find no legal issue concerning which reasonable judges might entertain divergent views so material as to warrant creating a conflict between reported decisions of the two Circuits in what is essentially the same case. Therefore, it is not necessary to resort to the doctrine of res judicata to reach the same conclusion as that reached by the Chiasson court and we specifically do not reach that issue.[1]
As we find for NOPG on the merits, we also do not reach NOPG’s exception of prescription.
*37 Expanding upon the Chiasson rationale, we find that the language found at the beginning of both the Asset Purchase Agreement and the Bill of Sale, “... |4N0PG now[2] possesses certain rights to publish legal advertising ..to be of paramount importance. Nowhere in either document is there any reference to future rights. The argument of the T-P concerning future rights to publish legal notices would be stronger if either document contained a reference to future rights in contrast to the present tense “now”.[3] The argument of the T-P also would be stronger if the documents did not contain such a pointed reference to current rights by specifically emphasizing the present tense nature of the rights conveyed by employing the emphatic present tense term, “now.”[4] The use of the term “now”[5] was not necessary to convey presently held rights. “NOPG possesses certain rights,” is sufficient to encompass all current rights without the necessity of including the term “now.” For the purpose of conveying present rights, adding “now” to the phrase is redundant surplusage. The addition of the phrase of the term “now”[6] in the documents reads in a stilted and unnatural manner, adding an emphasis that is difficult to dismiss as accidental or gratuitous. A bill of sale implicitly conveys current rights without the necessity of so stating, and of the many such conveyances and agreements this Court has seen, it recalls none in which it was considered necessary to employ the term “now,”[7] except in the context of such language as “now and in the future.” This Court finds it significant that there is no “now and in the future” language to be found in the documents. The only reasonable explanation for what appears to be the deliberate and considered inclusion of the term “now”[8] is to distinguish current rights which were | .¡intended to be conveyed by the documents from future rights which were not contemplated by the documents.
The anti-competitive nature of the Asset Purchase Agreement and the Bill of Sale is of particular significance here where the business that is the subject of this litigation, the publication of legal notices, is a matter affected with the public interest. Times Picayune Pub. v. City of New Orleans, 99-1685 (La.App. 4 Cir. 2/23/00), 760 So.2d 375, 386, writ denied 2000-1842 (La.10/6/00), 771 So.2d 84. We recognize that the Supreme Court in La. Smoked Products v. Savoie’s Sausage, 96-1716 (La.7/01/97), 696 So.2d 1373 (La.1997), signaled a much more tolerant attitude towards anti-compete compacts executed between corporations of presumably equivalent bargaining power than is deemed appropriate under similar agreements in an employer-employee context. We admit that in the absence of the opinion expressed in Savoie’s Sausage, this Court would be inclined to follow the view expressed by the dissenters in that case, at least to the extent of construing ambiguities in non-compete agreements in favor of the right to compete even where the parties to such agreements are corporations deemed to be of equal bargaining power.
However, the majority in Savoie’s Sausage chose to resolve the tension between freedom to contract and freedom to com *38 pete in favor of freedom to contract where corporations of equal bargaining power are involved, and we respect and defer to that decision of the Supreme Court. On the other hand, we also note that the facts in Savoie’s Sausage dealt with a pre-1989 agreement. Consequently, all of the discussion in Savoie’s Sausage concerning corporations under amendments to La.R.S. 28:291 enacted in 1989 and thereafter would technically be dicta. But we should not ignore the fact that the Savoie’s Sausage | ficourt took great pains to analyze the legislative history of the 1989 amendments. Regardless of the fact that this Court might consider such analysis to be dicta, we feel that it would be presumptuous for this Court to presume to conclude that the Supreme Court would choose to ignore its own carefully considered research and analysis if faced with a post-1989 non-compete contract between corporations at some future date.
What distinguishes the policy considerations in the instant case from those of Savoie’s Sausage is that in the instant case there is a third party, unnamed in the Asset Purchase Agreement and the Bill of Sale, whose interests are affected by those documents — the general public. Times Picayune Pub. v. City of New Orleans, supra, at 760 So.2d 375, 386, writ denied. Where competition is in the public interest, as it must generally be presumed to be in the matter of public notice legal advertising, Id., 760 So.2d at 383, we find as a matter of public policy that all ambiguities, both in the law and in agreements that might limit competition adverse to the public interest, should be construed liberally in favor of competition and strictly construed against any limitation thereon. We find nothing in Savoie’s Sausage indicating that the Supreme Court expected lower courts to extend its philosophy favoring the freedom to contract between corporations of equal bargaining powers, in preference to freedom to compete, to areas where it is in the public interest to encourage greater competition.
Where it is undisputed that the entity, City Business, was excluded from the Asset Purchase Agreement and the Bill of Sale, it would be against public policy to deprive the public of the opportunity to consider the advantages of the public notice capabilities of that publication in the absence of a clear and unambiguous legal and factual basis for refusing to do so. To this Court the T-P’s argument 17concerning future rights is merely an able artful sophistry of skilled counsel to prevent future competition under a different name.
Consistent with this view, we conclude that as a matter of public policy it was not the intention of the legislature to permit the limitation of competition for public notice publishing business by allowing the purchase of “Grandfather Clause” rights separate from the purchase of the publishing entity and that as a matter of public policy, any ambiguity in LSA-R.S. 43:201C should be strictly construed against any construction that would limit competition and liberally construed in favor of competition. Expressed in more positive terms, we find that in enacting the “Grandfather Clause” provision found in LSA-R.S. 43:201C, it was the intention of the legislature to expand the pool of potential competitors. For the same reason we agree- with the extra emphasis given by the T-P at page ten of its original brief to the word “publication”[9] when quoting from the Grandfather Clause statute. It is significant that LSA-R.S. 43:201C refers *39 only to the “publication”[10] and makes no mention of a right that might arguably be transferable independent of the publication. Thus, the right inheres in the “publication”,[11] which in the instant case would be City Business, a right that could better be described as a qualification. And like the qualifications necessary to practice law or drive a car, this qualification does not exist separate and apart from the holder of the qualification. To read the statute as contended for by the T-P would result in manifest injustice to the public interest, and in the face of such manifest injustice the law of the case does not apply. Keaty v. Raspanti 2000-0221 (La.App. 4 Cir. 2/7/01), 781 So.2d 607.
Is At the time of the confection of the Asset Purchase Agreement in May of 1992, the T-P, and the Jefferson Parish Times & Democrat were indisputably qualified to be selected as publishers of official notices. Thus, it was not necessary for the T-P to purchase City Business’s Grandfather Clause rights in order to be qualified to publish official notices in Jefferson Parish. Therefore, assuming for purposes of argument only that it was the intention of the T-P in executing the Asset Purchase Agreement and Bill of Sale to acquire City Business’s Grandfather Clause rights, the only reason for doing so would be to prevent competition for those rights. In fact, as at the time of the confection of the Asset Purchase Agreement and the Bill of Sale no other publications were qualified to be selected to publish legal notices in Jefferson Parish, the purpose of the purchase of the Grandfather Clause rights separate from the entity would not have been- just to prevent competition from City Business, but to create an absolute monopoly on the selection process.
The T-P states in its reply brief that:
The Times-Picayune is not attempting to create a monopoly that would prevent NOPG from engaging or competing in the Legal Advertising Business as argued by NOPG. The Times-Picayune is merely attempting herein to compel by specific performance the transfer that was required pursuant to the Agreement.
This clever casuistry by able counsel for the T-P is belied by the totality of the circumstances in this case, including paragraph 32 of its original petition wherein the T-P specifically alleges that, “NOPG and the Times-Picayune are competitors,” a fact that would not be worthy of mention by the T-P were competition not the issue in this case. Regardless of how the T-P chooses to style its motives, they come down to the prevention of competition from City Business.
19This analysis merely serves to reinforce the conclusion already reached above that what the T-P is really asking this Court to do is to grant it non-competition protection theoretically contrary to the public interest[12], regardless of how artfully able counsel for the T-P may have employed different terms to describe its actions. Although we feel constrained by Savoie’s Sausage from applying the non-compete statute, La. R.S. 23:291, to the agreements that are the subject of this *40 litigation, we do feel that it is appropriate to resolve all doubts in favor of the public interest in freer competition. Although the T-P’s attempt to gain a lock on the Jefferson Parish legal advertising business may represent an excellent business strategy on the part of the T-P, and there is nothing legally or' morally wrong with what the- T-P is attempting to do, we presume that it is not in the public interest to limit competition in this area. The issue before this Court is not whether, in the opinion of this Court, the public would arguably be better served by the T-P’s wider readership. In this regard, in the absence of a Constitutional challenge to the selection process, it is not proper for this Court to substitute its opinion for how the publisher of public notices should be chosen for that of the legislature. To do so would be an impermissible intrusion upon the legislative prerogatives of the legislature embodied in our separation of powers. It is not the province of this Court to suggest to the State Legislature or the Sheriff of Jefferson Parish that the public interest might be served better by the selection of the publication with the widest possible circulation.
I inIn all of the foregoing analysis, this Court has limited its analysis to the documents as written, and, as requested by the T-P, we have refrained from considering parole evidence, evidence outside of the documents and evidence outside of the record, all as requested by the T-P. Likewise, we find that the trial court, in concluding that there were no ambiguities in the agreements between the parties, apparently relied entirely upon the language of the agreements. Thus we are not persuaded by the vigorous argument of the T-P urging this Court to give much greater weight to the decision of the trial court in this circuit (the subject of this appeal) in preference to the reported Chiasson opinion of the Fifth Circuit, because the trial court in this circuit rendered its decision pursuant to a full blown trial on the merits, whereas the Chiasson opinion was based on a motion for summary judgment. In other words, the evidence considered material by the trial court in rendering the judgment that forms the basis of this appeal, i.e., the Asset Purchase Agreement and the Bill of Sale, is no different from the evidence considered material by the Chiasson court and this Court. Therefore, although there may be a quantitative difference between the evidence in the two circuits, there is no qualitative difference in the evidence material to the decisions reached by the two circuits.
In interpreting the Asset Purchase Agreement and the Bill of Sale, the trial court appears to have completely overlooked the term “now”[13] found in both the Asset Purchase Agreement and the Bill of Sale. The trial court also made no attempt to explain away the non-compete clause found in both documents which flies in the face of the trial court’s conclusion that City Business’s Grandfather Clause rights were intended to be conveyed by those documents. Chiasson, supra, hi This failure to explain away the effect of the non-compete agreement and the unusual use of the term “now”[14] undermines the trial court finding of no ambiguity in the agreements. Additionally the trial court fails to explain why, in documents that go into such detail describing what is to be conveyed, the failure to specifically mention the Grandfather Clause rights of City Business does not, in combination with the foregoing factors, at the very least, create ambiguity. Furthermore, the trial court clearly failed to take into account the pub- *41 lie interest aspect of this litigation and the public policy considerations flowing therefrom which would serve to resolve the obvious ambiguities seen by this Court in consonance with our brethren on the Chi-os son court, in favor of greater competition, i.e., in favor of NOPG. The trial court was clearly wrong in finding no ambiguities in the documents.
This Court is not persuaded by the opinion from a foreign jurisdiction in Radio Communications Inc. v. Public Service Commission of Maryland, 50 Md.App. 422, 441 A.2d 346, 348 (Ct.App.1992). In Radio Communications the radio broadcast entity transferred substantially all of its assets, including its certificate of convenience and necessity. We infer that the transfer was tantamount to the acquisition of the entity itself and the opinion does not make it clear whether the transferring entity minus a few minor assets was transferred, or whether the entity was not transferred but substantially all of the assets were. This appears to be a distinction without a difference and distinguishable from the facts of the instant case.
In the instant case, there is no allegation that substantially all of the assets of City Business were transferred. In Radio Communications, the court described the | ^purchaser of the grandfather rights as the “successor in interest” of the selling corporation. Our reading of Radio Communications indicates that this was meant in the broadest sense. The T-P does not contend that it is the successor in interest to City Business in a general sense. Moreover, the fact that the rights at issue in Radio Communications were embodied in the statutorily created certificate of convenience, allows the conclusion that the existence of the rights in certificate form is, in itself, evidence that those rights should be transferable separate from the entity by transfer of the certificate. The opinion indicates that the certificate of convenience itself was transferred to the acquiring entity, thereby providing corporeal evidence of an intent to transfer the grandfather rights, evidence absent in the instant case. The court in Radio Communications was not called upon to determine whether the grandfather clause rights had been acquired by the successor corporation — no one disputed that fact. Instead the court was called upon to determine the nature and extent of those rights. Additionally, there were no anti-competitive issues presented to the court in Radio Communications. In fact, the purpose of the certificate of convenience in Radio Communications appears to be anti-competitive:
Distinguished from the position of the “grandfather” operators, any “proposed” radio common carrier which sought to operate in any of the “grandfather” territories or to extend its service into the established area of an existing certificated carrier was prohibited absent a showing and determination that the existing service was “inadequate to meet the reasonable needs of the public.” [Emphasis added.]
Id., at 423-424, 441 A.2d at 347.
Unlike the grandfather clause in Radio Communications, the grandfather clause statute in the instant case served to expand the pool of publishers eligible to |13compete for legal advertising, rather than restricting such competition as the certificate in Radio Communications was designed to do. Accordingly, our reading of Radio Communications only serves to reinforce our previously explained conclusion that La. R.S. 43:201C should be interpreted liberally in favor of competition.
As we find in favor of the NOPG on the merits of the main case, it follows that there is no merit in the T-P’s claim under the Louisiana Unfair Trade Practices and *42 Consumer Protection Law, including the claim for attorney’s fees. However, the mere fact that we rule against the T-P on this issue does not mean that we find it to be frivolous, especially in view of the fact that it is only one of many issues raised in this appeal. In the great scheme of this appeal we do not believe that this is an issue of great consequence or that NOPG was materially importuned thereby.
For the foregoing reasons, the judgment of the trial court is affirmed to the extent that it rejects the Times Picayune’s claim for unfair trade practices. In all other respects, the judgment of the trial court is reversed.

AFFIRMED IN PART AND REVERSED IN PART

JONES, J., dissents.
MURRAY, J., dissents with reasons.

. In this manner we avoid falling prey to some technical error of law by becoming entangled in the legal morass of various purportedly divergent issues and causes of action so expertly created by counsel for the T-P in order to thwart a plea of res judicata or lis pendens. Without ruling specifically on the res judicata issue, we do note and find it significant that once we find that the documents read as held by the Chiasson court, the T-P unfair trade practices claim automatically collapses into the failed claim on the merits thereby belying the T-P’s assertions as to the separate nature of their unfair trade practices claim.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. Emphasis added.

. As pointed out close by in this opinion, the fact that the T-P may be able to reach a wider readership does not permit this Court to substitute its judgment as to how legal advertising should be done in Jefferson Parish for the process mandated by the legislature and followed by the sheriff of that parish. While this Court might feel that reaching the greatest number of potential readers should be the paramount consideration, the legislature does not exceed its prerogative in establishing a process that allows other criteria to be used.

. Emphasis added.

. Emphasis added.